No. 14-3009

---

# In The United States Court Of Appeals For The Seventh Circuit

---

Tina Martin,

*Class Objector-Appellant*

v.

Sidney Reid, Alisha Barnett, Dawn Damrow and Fran Pennel,
on Behalf of Themselves and All Others Similarly Situated,

*Plaintiffs-Appellees*

v.

Unilever United States, Inc.; Lek, Inc.; and Conopco, Inc.
d/b/a Unilever Home and Personal Care, USA,

*Defendant-Appellee*

---

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division
Case No. 1:12-cv-06058
The Honorable Ruben Castillo

---

## BRIEF OF CLASS OBJECTOR-APPELLANT TINA MARTIN

---

Law Offices of Ronald A. Marron
Ronald A. Marron (CA Bar #175650)
651 Arroyo Drive
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665
ron@consumersadvocates.com
Counsel for Class Objector-Appellant
Tina Martin

Nancy L. Hendrickson (ARDC #6207710)
Hendrickson Law Firm
203 N. LaSalle Street, Suite 1620
Chicago, IL 60601
(312) 332-0855
nancy@hendricksonlawfirm.com

Local Counsel for Class Objector-
Appellant Tina Martin

**DISCLOSURE STATEMENT**

Class Objector-Appellant Tina Martin is an individual and has no corporate affiliations to disclose. *See also* Appellant Martin's Disclosure Statement filed on Sept. 25, 2014 (USCA Dkt. # 10).

Attorney Ronald A. Marron's Disclosure Statement is being filed concurrently herewith.

## CIRCUIT RULE 26.1  DISCLOSURE STATEMENT

Appellate Court No: 14-3009

Short Caption: Reid v. Unilever United States, Inc. (Appeal of Tina Martin)

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R.  App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [✔]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH  INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Tina Martin

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including  proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Law Offices of Ronald A. Marron, APLC

Hendrickson Law Firm

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

Attorney's Signature: s/ *Ronald A. Marron*    Date: 01/07/2015

Attorney's Printed Name: Ronald A. Marron

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  Yes ☒  No _____

Address: 651 Arroyo Drive
San Diego, CA 92103

Phone Number: (619) 696-9006    Fax Number: (619) 564-6665

E-Mail Address: ron@consumersadvocates.com

rev. 01/08 AK

**CIRCUIT RULE 26.1   DISCLOSURE STATEMENT**

Appellate Court No: __14-2905__

Short Caption: __Tina Martin v. Unilever United States, Inc., et al.__

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    [   ]    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    Tina Martin

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Law Offices of Ronald A. Marron, APLC

    Hendrickson Law Firm

(3)  If the party or amicus is a corporation:

    i)  Identify all its parent corporations, if any; and

      N/A

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

      N/A

Attorney's Signature: __s/ Nancy L. Hendrickson__    Date: __September 25, 2014__

Attorney's Printed Name: __Nancy L. Hendrickson__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☒  **No** ____

Address: __Hendrickson Law Firm, 203 N. La Salle St., Suite 1620, Chicago, IL  60601__

Phone Number: __312-332-0855__    Fax Number: __312-264-0767__

E-Mail Address: __nancy@hendricksonlawfirm.com__

rev. 01/08 AK

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ............................................................ I

TABLE OF CONTENTS ................................................................. II

TABLE OF AUTHORITIES ........................................................... IV

JURISDICTIONAL STATEMENT ................................................... 1

STATEMENT OF THE ISSUES ....................................................... 4

STATEMENT OF THE CASE ........................................................... 7

SUMMARY OF ARGUMENT ........................................................... 9

ARGUMENT ................................................................................. 11

    A. Standard of Review ............................................................ 11

    B. The Settlement Consideration Was Inadequate,
       Given the Strength and Value of Plaintiffs' Claims. ........... 12

         1. Reimbursement for the Price of Products Purchased
           is Limited to a De Minimis Fraction of the Total Sales
           of the Product. .............................................................. 13

         2. Reimbursement for Efforts to Repair Damaged Hair
           and for Medical Treatment is Limited.......................... 14

         3. The Settlement Did Not Account for
           the Likelihood of Punitive Damages. ......................... 17

         4. The Settling Parties Did Not Adequately Establish
           the Value of the Settlement Sufficient for District
           Court Approval ............................................................. 18

    B. The Settlement is an Inappropriate Vehicle for the
       Resolution of Tort and Personal Injury Claims. ................... 23

    C. The Settlement Provide No Injunctive Relief. ..................... 28

         1. The Settlement Has No Injunction Against Defendant's
           Continued Use of Corrosive Thioglycolic
           Acid in Hair Products. ................................................. 28

         2. The Settlement Has No Requirement that Defendant
           Verify or Enforce its Recall of the Hazardous Product. ......... 29

3.  The Settlement Provides No Relief from Coercive
        Releases Entered Into by Class Members Prior to
        Certification or Settlement................................................30

D.  The Settlement's Claim Resolution Procedures Are Vague,
     Arbitrary and Unduly Burdensome........................................ 31

E.  The Court's Deferral of the Fee Motion Until After Final Approval
     Was Granted Violated 7th Circuit Precedent, Rule 23, and Class
     Members' Due Process Rights................................................ 33

CONCLUSION............................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ........................................................ 26

*Butler v. Sears, Roebuck & Co.,*
   727 F.3d 796 (7th Cir. 2013) ........................................... 24

*Devlin v. Scardelletti,*
   536 U.S. 1, 9-10, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002) ........................................ 2

*Eubank v. Pella Corp.,*
   753 F.3d 718 (7th Cir. 2014) ....................................... 1, 18, 19, 21, 22, 23

*Exxon Shipping Co. v. Baker,*
   128 S. Ct. 2605 (2008) ...................................................... 17

*In Re Bridgestone/Firestone, Inc.,*
   288 F.3d 1012  (7th Cir. 2002) ..................................... 25, 26

*In re Dry Max Pampers Litigation,*
   724 F.3d 713 (6th Cir. 2013) ........................................... 18

*In re General Motors Corp. Engine Interchange Litig.,*
   594 F.2d 1106 (7th Cir. 1979) ......................................... 12

*In re Katrina Canal Breaches Litigation,*
   628 F.3d 185 (5th Cir. 2010) ........................................... 31

*Isby v. Bayh,*
   75 F.3d 1191 (7th Cir. 1996) ........................................... 11

*Mercury Interactive Corp. Sec's Litig.,*
   618 F.3d 988 (2010) ........................................................ 33

*Pearson v. NBTY Inc.,*
   slip op. at p. 10 (7th Cir. Nov. 19, 2014) ........................... 5, 32

*Pella Corp. v. Saltzman,*
   606 F.3d 391 (7th Cir. 2010) ........................................... 24

*Phillips v. Asset Acceptance, LLC,*
   736 F.3d 1076 (7th Cir. 2013) ......................................... 24

*Redman v. RadioShack Corp.,*
   7th Cir. No. 14-1470, 2014 WL 4654477 (7th Circuit, Sept. 19, 2014) ................. 33

*Reynolds v. Beneficial National Bank,*
   288 F.3d 277 (7th Cir. 2002) ............................... 1, 11, 18, 25

*Simer v. Rios,*
   661 F.2d 655 (7th Cir. 1981) ........................................... 26

*Spano v. The Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) ................................................................... 27

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*,
   463 F.3d 646 (7th Cir., 2007) ............................................................. 11, 12

*UHL  v. Thoroughbred Tech. & Telecomms., Inc.*
   309 F.3d 978 (7th Cir. 2002) ................................................................. 25


## Statutes

28 U.S.C § 1291 ......................................................................................... 2

28 U.S.C § 1294(1) ..................................................................................... 2

28 U.S.C. § 1332(d)(2)(A) ......................................................................... 1


## Rules

Fed. R. App. P. 4(a) ................................................................................... 3

Fed. R. App. P. 4(a)(1)(A) .......................................................................... 2

Fed. R. App. P. 4(a)(3) ............................................................................... 3

Fed. R. Civ. P. 23(e)(1)(C) ....................................................................... 11

Fed. R. Civ. P. 23(h) ................................................................................ 33

Fed. R. Civ. P. 54(a) ................................................................................... 2


## Other Authorities

4 Newberg on Class Actions § 11:46 at 133 ............................................. 30

Manual for Complex Litigation § 1.46 (4th ed. 1977) ................................ 9

## JURISDICTIONAL STATEMENT

Class Objector-Appellant Tina Martin filed her Jurisdictional Statement on October 14, 2014.  USCA Dkt. # 15.

<u>District Court Jurisdiction</u>

That Jurisdictional Statement noted that Appellant Martin was not a named party litigant below. She is an absent class member who appeared through counsel to file an objection to the settlement of this case. ND Ill. No. 12-cv-06058, Dkt. ## 116, 139. She therefore has standing to object and to appeal. *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 287 (7th Cir. 2002); *Eubank v. Pella Corp.*, 753 F.3d 718, 719 (7th Cir. 2014) (observing that, although not parties, members of the class are "authorized to appeal from an adverse judgment").

Federal diversity jurisdiction in the district court is founded upon 28 U.S.C. § 1332(d)(2)(A), which provides original jurisdiction in civil class actions "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs" and in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." Plaintiffs here credibly alleged a multi-state class, that there are at least 100 class members, that the amount in controversy exceeded $5,000,000, and at least one member of the class was necessarily a citizen of a state other than any defendant *See* Dkt. # 60 at ECF 5-6 (First Amended Complaint or "FAC"). In this case, there appears to have been the minimal diversity of citizenship required under 28 U.S.C. § 1332(d)(2)(A). Plaintiffs alleged in their FAC that the four representative plaintiffs were citizens of Illinois, Alabama,

Wisconsin, and Nevada. Dkt. # 60 at ECF 5-6, 17-20. Plaintiffs alleged that

Defendant Unilever United States, Inc., is located in New Jersey and is a subsidiary

of a dual-listed company headquartered in both Rotterdam, Netherlands and

London, United Kingdom. They alleged that Defendant LEK was a foreign

corporation with its principal place of business in Knowlton, Quebec, Canada. And

they alleged that Defendant Conopco is a New York corporation with its principal

place of business located in New Jersey (all Defendants do business as Unilever

USA and are therefore collectively referred to herein as "Defendant"). *Id.* at ECF 6,

21-23. It therefore appears the district court had diversity jurisdiction.

<u>Appellate Court Jurisdiction</u>

The order approving the settlement was entered on July 29, 2014, and resolves

entirely the claims of all parties and class members. Dkt. # 143. This Court

therefore has jurisdiction to hear this appeal pursuant to Federal Rules of Civil

Procedure 54(a), and 28 U.S.C §§ 1291 and 1294(1). As noted above, Appellant

Martin objected before the district court. Her objection was overruled by the Order

approving the settlement and release of claims. *See* Dkt. # 143.  She therefore has

standing to appeal the adverse judgment. *Eubank*, 753 F.3d at 729 (citing *Devlin v.*

*Scardelletti*, 536 U.S. 1, 9-10, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002).

Appellant Martin's appeal is timely.  Rule 4(a)(1)(A) requires that the notice of

appeal must be filed within 30 days of the entry of the judgment or order appealed.

Here, another absent class member who appeared and objected to the settlement,

Yolanda Loyd Reed, first timely appealed on August 27, 2014. See Dkt. # 161. That

filing extended the deadline for additional appeals by 14 days, to September 10, 2014. Fed. R. App. P. 4(a)(3). Ms. Martin filed her Notice of Appeal on September 9, 2014 (Dkt. # 169); thus, her appeal is timely under Federal Rule of Appellate Procedure 4(a).

## STATEMENT OF THE ISSUES

1. Did the district court abuse its discretion in granting final approval to a class action settlement for which it lacked a reasonably accurate quantitative analysis of the benefits provided versus the risks and benefits of proceeding in litigation, as required by this Circuit?

2. Did the district court abuse its discretion in granting final approval to a class action settlement when the court had conflicting data as to the number of units of Product sold and insufficient data on the value of class members' personal injury claims?

3. Did the district court abuse its discretion in granting final approval to a class action settlement when the settling parties provided no evidence of Defendant's liquidity, net worth, or ability to pay a higher judgment?

4. Did the district court abuse its discretion in finding the settlement fair, reasonable and adequate when the court lacked a reasonable estimate of dollar amount to be paid in claims through all claims procedures, while unclaimed funds would revert to the defendant, making the $10.25 million claim fund an illusory number?

5. Did the district court abuse its discretion in finding the settlement's distribution scheme fair, reasonable, and adequate when there were no standards for how personal injury claims would be evaluated and compensated, and only a limited, arbitrary right of administrative appeal?

6.  Whether the district court erred in finding that a class action settlement was an appropriate vehicle for lumping together serious personal injury claims with economic only claims, including a claims process that would unfairly diminish the value of claims for those seriously injured by the Product due to pro rata reduction by those with economic-only claims?

7.  Whether the district court abused its discretion in approving a class action settlement that did not provide for a permanent injunction precluding Defendant from reintroducing the same or similar hair care products containing the same or similar harmful chemicals in future?

8.  Whether the district court abused its discretion in finding the settlement fair, reasonable, and adequate even though the settlement failed to include an injunction requiring Defendant to take steps to confirm removal of the Product from store shelves?

9.  Whether the district court erred in granting final approval to a class action settlement that upheld unconscionable releases entered into by class members, without the assistance of counsel, by excluding those people from the class definition?

10. Whether the Settlement's extensive documentation requirement for serious injury Option C claimants benefit Defendant and Class Counsel at the expense of the Class, in violation of this Court's ruling in *Pearson v. NBTY Inc.,* slip op. at p. 10 (7th Cir., Nov. 19, 2014).

11. Whether the district court violated class members' due process rights, Rule 23, and this Circuit's precedent by permitting class counsel's fee motion and proceeding to take place after final judgment approving the settlement occurred, and without (1) being directed to class members and (2) permitting class members to comment on it?

## STATEMENT OF THE CASE

The underlying case giving rise to this appeal sought to protect the public health from a harmful hair care product that caused physical injury by destroying consumers' hair and burning their scalps. The case was first filed in the Northern District of Illinois (*Reid, et al. v. Unilever United States, Inc., et al.*, Case No. 12-CV- 6058), asserting claims against Unilever USA for breach of warranty, violation of consumer fraud and deceptive trade practices statutes, and unjust enrichment, on behalf of a nationwide class of consumers, relating to the manufacture, advertising and sale of a product sold nationwide under the name "Suave® Professionals Keratin Infusion 30-Day Smoothing Kit" (the "Product"). Related actions filed in Kentucky and California were removed and consolidated with the *Reid* action.

The cases ultimately settled, with the proposed class including all persons in the United States who purchased the product prior to February 17, 2014, with certain exceptions. Dkt. # 90-1 ("Settlement Agreement" or "Settlement") at ECF 4. The Settlement Agreement provided for the establishment of a total cash settlement fund of $10,250,000. *Id.* at ECF 6. The Settlement released all class members' claims that were or could have been asserted in the action. *Id.* at ECF 22.

Appellant Martin alleges the district court abused its discretion in granting the Settlement final approval because the court had no valuations before it of (i) the true value of all the class members' claims, including those released by Unilever prior to Class Counsel's involvement, through unconscionable releases, (ii) the true

number of units sold, (iii) the potential value of punitive damages, or (iv) the ability of Defendant to pay.

Moreover, the Settlement imposes a burdensome claims procedure on those injured most, requiring them to submit documentation to a Special Master, but no guidance on how those personal injury claims would be valued, and very limited methods of administrative appeal in return for total extinguishment of claims. On the other hand, Defendant reserved its right to assert all defenses during this claims process. And, since this claims process has not yet occurred (although any unclaimed funds will revert to Defendant), there was no way for the trial court, or class members, to know how much of the purported $10.25 million injury fund would actually even be paid to the class. As such, the court could not have ascertained whether the Settlement was truly fair, reasonable, and adequate to class members. The court therefore abused its discretion in granting final approval without this information, approving an illusory settlement figure.

Appellant also alleges the trial court erred in granting final approval to a Settlement that imposed no injunctive relief whatsoever, allowing Unilever to continue to sell the same damaging hair care products or other similar products containing the same ingredient. The Settlement also failed to make Unilever accountable for its faulty recall program, such that Product is still on store shelves.

## SUMMARY OF ARGUMENT

Class Objector-Apellant Tina Martin objects to the district court's final approval of the settlement on five primary grounds:

First, the court deferred its decision on, and the briefing of, class counsel's motion for fees until after the objection deadline. This violated 7th Circuit precedent, Rule 23, and deprived class members of due process, namely, their opportunity to comment on the fee motion in a meaningful way,

Second, the claim distribution and resolution processes should not have been approved for lack of specificity, fairness, and compliance with Rule 23. For example, if the number of claims exceed the money in the Injury Fund, the administrator is permitted to distribute the money in accord with an unknown formula to be established by the Special Master and approved by the court. Similarly, personal injury claimants' applications for relief are subject to an ambiguous standard – that they will be treated similarly to other personal injury claimants but at the same time allow Defendant to assert factual defenses that may be unique to some. And, personal injury claimants must produce exhaustive documentation on their claims, essentially creating mini-trials for these class members. These facts mitigated against approval of the settlement agreement.

Third, the settlement agreement had no injunctive relief provisions at all, even though certain relief was absolutely necessary. For example, the settlement did not require Defendant to cease its use of the same harmful chemicals in their hair care products that were the cause of the underlying lawsuit. It did not require

Defendant to verify or actually enforce its recall of the products, such that the harmful product is still on the marketplace.  And, the settlement did not require Defendant to allow people who had entered into unconscionable releases prior to the lawsuit or settlement to claim from the fund.

Fourth, the settlement cobbles together economic only relief claimants with personal relief claimants.  But the nature of the personal injury claims are such that, admittedly, individual issues predominate.

Finally, the $10.25 million fund was inadequate, in light of sales of the product, the possibility of punitive damages, and the district court's lack of data on the true value of the personal injury claims, which have yet to be arbitrated.  The low number of claims filed to date reflect that this settlement is really only set to pay out tens of thousands of dollars, and an unknown number for personal injury class members.  The court should therefore not have approved the settlement.

## ARGUMENT

### A.    Standard of Review

The district court's role in evaluating class action settlement is that of a fiduciary, with a high duty of care, to "exercise the highest degree of vigilance in scrutinizing proposed settlements." *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279-280 (7th Cir. 2002).

To approve a proposed class action settlement, the district court must find it is "fair, reasonable, and adequate." *Synfuel Techs., Inc. v.DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir., 2007) (citing Fed. R. Civ. P. 23(e)(1)(C)).  Several well-recognized factors are used to evaluate a settlement agreement including "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Id.,* quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996). The court should "insist the parties present evidence that would enable possible outcomes to be estimated" so that the court can at least come up with a "ballpark valuation." *Reynolds,* 288 F.3d at 285.

The Seventh Circuit has made it absolutely clear that, of the factors set forth in *Isby,* the most important is "the strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1132 (7th Cir. 1979)(*citing* the Manual for

Complex Litigation § 1.46 at 56 (4th ed. 1977)).  In *Synfuel,* the Seventh Circuit reversed approval of a class action settlement because the trial court uncritically accepted class counsel's contentions regarding the value of the settlement, even though those contentions were not supported by sufficient empirical data to make even a rough estimate of the settlement's value.  *Synfuel,* 463 F.3d at 654. Moreover, the trial court did not articulate any rationale to support its conclusion that the level of compensation was fair.  *Id.*

**B.**     **The Settlement Consideration Was Inadequate, Given the Strength and Value of Plaintiffs' Claims**.

Here, the district court erred in granting final approval because it was faced with a lack of data to support Plaintiffs' conclusory contentions that the Settlement's funding of $10,250,000 was fair consideration for the claims the class will be giving up.

The allegations are serious, involving the inclusion of hair-removing chemical agents (corrosive depilatories) in cosmetic products intended for use on the human scalp. Plaintiffs' awareness of the strength of their case for damages was demonstrated by the scope of the allegations set forth in the First Amended Complaint (FAC) and by their inclusion of counts for Strict Liability and Gross Negligence, including demands for punitive damages.  It appears from the record that Plaintiffs' factual allegations were well-founded, so that the potential financial consequences to the Defendants included a considerable risk of substantial exemplary damages.

Nevertheless, the Settlement approved by the trial court established an inadequate $10 million "Injury Fund," while even modest levels of claims for consumer fraud refunds would exhaust the $250,000 Reimbursement Fund.

## 1. Reimbursement for the Price of Products Purchased is Limited to a De Minimis Fraction of the Total Sales of the Product.

The Notice Plan advised that while the class size is indeterminate, approximately 225,000 units of Product were sold.  Affidavit of Jeffrey D. Dahl, Dkt.#90-14, ¶11 at p. 4.  However, Plaintiffs were aware that the Food and Drug Administration (FDA) has posted information on its website indicating that "381,288 kits in commerce nationwide . . . were recalled" around May 2012, that "[r]etailers were advised by Unilever to cease immediately distribution of the Product and were advised to send the Product back to Unilever," but that "some retailers continued to sell the Product after the recall."  FAC ¶¶43-45.

Therefore, tens of thousands of additional kits were likely to have been sold, even after the recall, some of them through outlets for discontinued merchandise such as Big Lots.

The FAC alleged that four different representative plaintiffs bought the Product at prices ranging from $10 to as much as $20 per unit.  FAC ¶¶65-72. Therefore, each unit of Product presumably sold for <u>at least </u>$10 per unit, which would exhaust the $250,000 Reimbursement Fund if a mere 25,000 claims were filed, representing only 11.1% of the total units that Defendant is willing to admit were sold.

And, because Defendants' 2012 recall of the Product was ineffective in removing the Product from the market, as discussed herein, the numbers actually sold could

be significantly more than 225,000 units, generating an even larger class of purchasers that would exhaust the Reimbursement Fund even sooner.

### 2.     Reimbursement for Efforts to Repair Damaged Hair and for Medical Treatment is Limited.

The Settlement proposes a $10,000,000 "Injury Fund."  Most class members would be limited to compensation of either up to $40 ("Option A," without receipts) or up to $800 ("Option B," with receipts).   Plaintiffs allege, however, that the number of persons who experienced serious bodily injury to their hair or scalp was quite high.  Plaintiffs have thus far not presented sufficient data to resolve this issue of the number of class members injured and a quantification of the value of their personal injury claims.  *See* Required Short Appendix filed herewith ("AR") at 60:14-15 (stating that as of June 11th, there were 2,555 claims, of which "516 were potential injury claims," but providing no dollar amount relating to those claims); *id.* at 61:12-13 (stating that as of July 6th there were 2,950 claims but not separating out injury claims or stating dollar amount to be paid); *id.* at 65:14-16 (stating there were "458 Option A claims," 67 Option B claims, and 131 Option C claims, which totals 656, but not stating the dollar amount to be paid); *id.* at 66 (vaguely claiming that if all claims were paid at double amount, it would be less than the $10 million settlement fund).  Indeed, given Class Counsel's admission that there were only 656 claims from the Injury Fund, there is no way that payment would begin to approach even half the "value" of the $10 million Injury Fund settlement represented to the court.  In fact, assuming Defendant pays all the claims at full value, which is not likely to occur, this means the Settlement's value

cannot exceed $3,346,000. *See* AR 19-21 (allowing up to $40 for the 458 Option A class members; $800 for the 67 Option B class members; and $25,000 for the 131 Option C class members). Subtracting the Option C class members, whose claims may be eliminated entirely due to Defendant's right to introduce facts and releases to get out of paying those claims, leaves a true total "value" of the Injury Fund at $71,600. *See* AR 22 (Settlement Agreement § 4(C)(ii)); AR 70 ( the court, noting Defendant can "defend the injury claims on the basis of either facts or releases"). This is a far cry from the purported value of the $10 million Injury Fund represented to the court, and demonstrates that the district court erroneously assumed the value of the Settlement to be much higher than it could have been.

In the alternative, in the absence of more precise empirical data regarding the magnitude of out-of-pocket remediation, it can be postulated that 20,000 persons (less than 10% of the likely size of the class, assuming one product purchased by each class member) would exhaust the Injury Fund if their claims averaged a mere $500 each, while the settlement's structure anticipates that even "non-serious" injuries are anticipated to generate out-of-pocket expenses up to $800. Three of the four representative plaintiffs in the FAC allege that they each spent "hundreds of dollars" on remediation efforts. FAC ¶¶ 69,71,73. Regardless, it is likely that the Injury Fund would be rapidly depleted by Option A and Option B claims alone, even without invoking the much larger damages involved in the Option C claim, all of which will compete for the same $10 million fund. AR 18-23. Indeed, the Injury

Fund ultimately reverts to Defendant, such that Defendant is also competing for the same funds as class members.  AR 23.

The Settlement's proposed process for compensation of serious bodily injuries is also unfair and indicates the district court abused its discretion in granting final approval.  The Settlement subjects seriously injured victims to a cumbersome and arbitrary "Option C" process.  Option C is limited to payment of $25,000 per claim submitted, with claims determined by a Special Master, after submission of extensive evidence, with a limited and arbitrary right of administrative appeal.  No indication is made of who would represent class members that submit to the Option C process or how their rights would be protected or who would select and pay for the Special Master.  Moreover, the Settlement Agreement releases all claims by class members and allows no further right to sue.  AR 22 (Settlement, § 14(C – D)).

Preliminary anecdotal evidence indicates that "many [plaintiffs] have personal injuries for which the $25,000 limit is far too low."  *See* Absent Plffs.' Mot. for Expedited Consideration of Opt-Out Requests and to Lift Injunction, n.4. (Dkt. #100 at p. 7).  Defendant is therefore the primary beneficiary of the Option C process, which forces severely injured plaintiffs to choose between two evils, either sacrificing much of the value of their claims under an onerous Option C process (and risking a pro-rata reduction below $25,000 if the limited Injury Fund is over-subscribed) or opting-out and submitting to the vagaries of time-consuming individual litigation.  *See* AR 21-23.

### 3. The Settlement Did Not Account for the Likelihood of Punitive Damages.

The class action complaints charged Defendant with counts of negligence and gross negligence, and requested punitive damages. Absent complete exoneration, Defendant is liable for the serious bodily injuries sustained by class injuries, because it is indisputable that thioglycolic acid, a corrosive depilatory agent, was included in the Product at sufficiently high concentrations to cause severe hair loss and burns when used according to Defendants instructions. Moreover, Plaintiffs have alleged facts tending to prove that Defendant knowing and intentionally concealed the dangers of the Product and continued to sell the Product to class members, resulting in serious hair loss and scalp injuries. *See*, *e.g.*, FAC ¶49. If proven at trial, such reckless behavior by a defendant provides ample grounds for punitive damages.

In *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2634 (2008), the Supreme Court set 1:1 as a reasonable ratio of punitive to compensatory damages. . Accordingly, the value of Plaintiffs' case could be doubled, and the amounts proposed to be provided by Defendants to pay claims are even more unreasonable in view of the likelihood that punitive damages would have been awarded at trial.

The overall undervaluing of the prospective Class' claims, along with Plaintiffs' failure to provide any survey data to estimate out-of-pocket remediation costs incurred by the prospective Class must be added to other evidence herein that Class counsel have provided inadequate representation, and that the settlement should not have been approved.

**4.    The Settling Parties Did Not Adequately Establish the**

**Value of the Settlement Sufficient for District Court Approval**

At final approval, Plaintiffs argued that a settlement could be approved even if it amounts to a fraction of the potential recovery at trial.  *See* Plffs.' Mem. of Law in Support of Motion for Final Approval of Class Action Settlement, Dkt. No. 126 ("Plaintiffs' Brief") at 32.  That is true, and examples abound.  But the trial court in this case was not presented with an adequate analysis of what that potential recovery might be, much less what fraction the gross settlement represents, or the net amount of that likely to be taken home by class members.  *See* AR 60-67. Plaintiffs made no estimate of the potential recovery at trial to compare to the value of the settlement.   Plaintiffs likewise made no estimate of the number of class members who might claim, or the potential aggregate amount of the gross fund the class might actually obtain.  Yet the trial court needed that information to exercise its discretion, and should not have approved this settlement without it.  *See* AR 3-4 (final order approving this Settlement, but without any discussion of the risks versus benefits).

The Seventh Circuit is very clear in its requirement that settling parties must provide a quantitative analysis of the benefits provided by the settlement balanced against the risks and potential benefits of proceeding in litigation.  *Reynolds v. Beneficial Nat'l. Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002).  That includes an estimation of the likely outcome of a trial.  *See id.* at 285; *Eubank*, 753 F.3d at 726-727; *See also In re Dry Max Pampers Litigation*, 724 F.3d 713, 719 (6th Cir. 2013) ("[T]o the extent the parties here argue that the settlement was fair because the

refund program has actual value for consumers, it was the parties' burden to prove the fact, rather than [objector's] burden to disprove it.").

That burden is neither met by vague, conclusory recitals, nor by simply reciting a large settlement amount.  *Id*; *Reynolds*, 288 F.3d at 280 ("We do not know whether the $25 million settlement that the district judge approved is a reasonable amount given the risk and likely return to the class of continued litigation; we do not have sufficient information to make a judgment on that question.").   That is particularly true in this case, which requires claims to be filed and determined, and in which unawarded amounts *revert* to the defendant.  *See* AR 23 (Settlement Agreement at ¶4(D)).   *Cf. Eubank*, 753 F.3d at 723 (criticizing district court for making "no attempt to estimate how many claims were likely to be filed, though without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made." ).

Indeed, the district court here approved the Settlement without knowing the dollar amount of claims to be paid, a process this Court has rejected.  *Id.* at 723 ("Not only did the settlement agreement not quantify the benefits to the class members, but the judge approved it before the deadline for filing claims. He made no attempt to estimate how many claims were likely to be filed, . . . without such an estimate no responsible prediction of the value of the settlement to the members of the class could be made.")  Here, Class Counsel informed the Court that just under roughly 2500 claims had been made and of those 516 were "potentially injury claims."  AR 60; *but see* AR 65 (stating there were 656 injury claims, combined).

19

Defendant Unilever, however, retained all defenses to those potential injury claims, Settlement Agreement § 4(C)(ii), reserving the right to submit "any additional factual material it possesses from records maintained in the ordinary course of its business." AR 22. In other words, Defendant can and will attempt to deny payment of some or all of those serious injury claims entirely. *Id.* One of the bases for doing so will be because of the unconscionable releases entered into prior to the Settlement being reached. AR 69-70 (noting that one basis Defendant would try to block compensation under this Settlement is because those claimants "have signed a release with Unilever"). This begs the question of why those claims would not have been excluded already, prior to submission to the district court as potential claimants. Either way, the trial court did not have a valuation of the claims to be paid to class members under Options A-C.

The approach the Settling Parties have taken here was far too vague to permit this trial court to make a rational determination. On the issue of risk, Plaintiffs say that a "successful resolution…was never guaranteed" because defendants contested the allegations. Plaintiffs' Brief at 20. Thus continued litigation would be "fraught" with disputes over class certification, causation, liability, and damages. *Id.* Finally, Plaintiffs note that defendants "certainly could appeal any judgment….delaying further any possible recovery." *Id.* But these generalized observations about litigation risk could apply to almost any class action settled at the same stage of litigation. Plaintiffs never expand or quantify them to explain how much of an obstacle they present in this case, as opposed to any other.

Defendant Unilever is more specific, asserting that Plaintiffs' claims are weak because Defendant would assert that the basic allegations were incorrect, that the product was in fact safe, and that customers harmed physically by the product did not follow the instructions properly.   *See* Def. Unilever United States, Inc.'s Mem. in Support of Final Approval of Class Action Settlement, Dkt. No. 135 at 3-4.  Yet this is a case in which the product was recalled, and unquestionably affected thousands of people adversely.  In any event, as the Seventh Circuit noted in *Eubank*, such protestations ring hollow when, at the same time, a defendant is ostensibly willing to put up millions of dollars to resolve the case.  *Eubank*, 753 F.3d at 727-728.

Moreover, Unilever has not given up its right to assert some or all of these same defenses against claiming class members.  *See, e.g.*, AR 22 (Settlement Agreement at ¶4(C)(ii)) ("Unilever reserves the right to submit to the Special Master any additional factual material it possesses from the records maintained in the ordinary course of its business with respect to any Claimant.").  For example, based upon its argument here, Unilever may assert against injury claims the tautological defense that any class member harmed by the product must not, as a matter of fact, have followed the instructions.  *Cf. Eubank*, 753 F.3d at 727 ("Pella argues that it would fight the individual damages claims if the case were litigated. But the settlement agreement allows it to fight the damages claims submitted to it pursuant to the agreement."); *see also id.* at 726 (surmising that defendant might expect, by opposing claims, to "knock 75 percent off the damages sought by class members who

filed claims that were submitted to arbitration.").  As far as risk, therefore, the proposed settlement does more to eliminate it for Unilever, while preserving risk for seriously injured class members.[1]

Turning to the benefits provided, Plaintiffs merely reiterate the settlement's financial relief provisions (Plaintiffs' Brief at 20) and then leap directly to the conclusion that "a balancing of the significant risks" of continued litigation and the "finality and tangible benefits" provided by the settlement supports approval. Plaintiffs' Brief at 21.  But the Settling Parties have not presented a balancing of risks and benefits.  What was before the trial court was a generalized description of risks attending class litigation of this type, along with Defendant's assertion it denied the allegations and was prepared to litigate.  Juxtaposed against that is a bare description of the benefits of the Settlement, including a purported $10.25 million fund against which far less claims had actually been made (and an unknown amount would be paid) followed by the conclusion that the Settlement is adequate in light of the risks.  The parties' unquantified assertions about the value of the Settlement are not only underwhelming, they raise serious red flags the district court should not have ignored.  *See Eubank*, 753 F.3d at 726 ("Pella's estimate that

---

[1] One of the central risks regarding class certification is the possibility that this Court would not certify a multistate personal injury class, or any class on the grand scale imagined in the settlement.   But what is "risk" to the principal litigants is not always "risk" to absent class members.  Such a ruling might drastically reduce scope and financial value of the case actually certified.  And, as law of the case, it might also make a later settlement like this one -- in which the defendant seeks to consolidate and release as much liability as possible in a single class settlement -- more difficult.  But that result would not necessarily prejudice or harm individual class members, particularly those with injuries serious enough to warrant an individual action, who would not have the onus put upon them to become aware of the case and opt out to preserve their rights.

the class will recover $22.5 million assumes against all reason that every one of the claims will reap the maximum authorized benefits—$750 for the simple claims and $6000 for the claims that go to arbitration. . . . [but] [t]here is no evidence that Pella would pay the maximum benefits").

Plaintiffs suggest the value of the settlement is that it grants class members "an opportunity…to seek and obtain a fair recovery for their claims." Such an opportunity to claim damages is suspect, particularly when class counsel intend to be paid up-front by reference to the gross settlement fund, and not the amounts that might eventually be awarded to claimants:

> [T]he settlement did not specify an amount of money to be received by the class members as distinct from class counsel. Rather it specified a procedure by which class members could claim damages. So there was an asymmetry: class counsel was to receive its entire award of attorneys' fees up front; class members were to obtain merely contingent claims . . . .

*Eubank*, 753 F.3d at 723. Given that Class Counsel's fee would be measured by the gross settlement amount, Class Counsel here had scant incentive to argue for or craft claims procedures and standards that would actually result in fair awards to the class members they represent. That is particularly true given the complexity of that task, as set forth herein.

## B. The Settlement is an Inappropriate Vehicle for the Resolution of Tort and Personal Injury Claims.

Plaintiffs acknowledged that the procedure for allocating the Settlement funds must be reasonable and equitable. Plaintiffs' Brief at 37-38. Again, however, Plaintiffs discussion of the matter was limited to reciting that there is a fund, that

class members have a right to claim against it, and that bodily injury claims will be determined by a Special Master. *Id.* at 38. The district court should have questioned why it is procedurally appropriate to impose a substitute adjudicatory scheme upon plaintiffs with diverse personal injury damages, and why it is substantively fair that the scheme imposes limitations on the amount and type of damages available, both to individual claimants and to the class as a whole.

More fundamentally, the Settlement provides few standards upon which personal injury damage claims will be determined and compensated. For example, will variations in claimants' respective state laws be considered in determining the award? The Settlement is entirely unclear. *See* Dkt. # 90-8 (Settlement Agreement, Ex. 5 – "Guidelines" - asserting vague standard that the "Special Master shall endeavor to render awards in a fashion that will compensate all Claimants with similar injuries in a similar fashion" but also that "the Special Master shall consider individualized facts and circumstances as she deems appropriate in rendering an award.").[2] Will any class member really receive the $25,000 that Option C provides?

---

[2] Plaintiffs cite a smattering of out-of-circuit authority for the proposition that courts can certify classes involving consumer fraud or personal injury claims, at least as to common issues of liability, without common proof of individual damages. Plaintiffs' Brief at 29-31. Standing alone, the point is unremarkable: the Seventh Circuit has said essentially as much itself. *See, e.g. Pella Corp. v. Saltzman*, 606 F.3d 391 (7th Cir. 2010); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013). But there is a distinction between cases in which the same basic legal theories apply, but actual damages differ among class members, and this case, in which there are not only differing types of physical and financial harm, but also multiple legal theories potentially applicable to liability and damages, which also vary state-to-state. *See Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013) (advising, in the course of remanding class certification in debt collection case, that although Butler held that potential differences in actual damages might not defeat class

In *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999) the Supreme Court

emphasized that although settlement is relevant to class certification,

the requirements of Rule 23 must still be satisfied. Thus, a district

court may not abandon the Federal Rules merely because a settlement

seems fair, or even if the settlement is a 'good deal.' In some ways, the

Rule 23 requirements may be even more important for settlement

classes, for which (as this court has put it), the district court must act

almost as a fiduciary of the class when approving settlements.

*UHL v. Thoroughbred Tech. & Telecomms., Inc.* 309 F.3d 978 (7th Cir. 2002); *see*

*also Reynolds,* 288 F.3d at 279-80.

Ordinarily, personal injury cases present too many individualized issues of law

and fact for class treatment under Rule 23.  There are invariably individual factual

circumstances surrounding the use of the product leading to harm, and the types

and degree of harms that result vary among individuals.  Moreover, the variant

state laws applicable to such a case normally preclude certification, for lack of

commonality and superiority.  *See In Re Bridgestone/Firestone, Inc.*, 288 F.3d 1012,

1015  (7th Cir. 2002) ("[S]tate laws about theories such as those presented by our

plaintiffs differ, and such differences have led us to hold that other warranty, fraud,

or products-liability suits may not proceed as nationwide classes.").

---

certification, that variant state laws might also apply among class members presented an
additional  "complicating factor.").   In the settlement context, the problem is not the theory,
but the application and execution.

One exception exists where the defendant faces claims that exceed an available "limited fund" such that the court must take jurisdiction over the fund to ensure its just distribution among claimants or to prevent inconsistent adjudications. *E.g., Simer v. Rios*, 661 F.2d 655, 668, n.24 (7th Cir. 1981) (noting "limited fund" theory). But the parties have neither argued nor established that this case falls within that exception. The district court was presented with no evidence that Defendant is subject to a limited fund analysis (i.e., on the verge of bankruptcy or with a finite amount from an insurance policy to compensate claimants). *See* Plaintiffs' Brief at 20-36.

It is no answer that resolving all potential claims in a single forum is convenient or efficient:

> Differences across states may be costly for courts and litigants alike, but they are a fundamental aspect of our federal republic and must not be overridden in a quest to clear the queue in court. [*Citations omitted.*] Tempting as it is to alter doctrine in order to facilitate class treatment, judges must resist so that all parties' legal rights may be respected.

*In Re Bridgestone/Firestone, Inc.*, 288 F.3d at 1020-1021 (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997)).

There is no good explanation for presumptively capping total personal injury liability claims at $10 million, and forcing individuals with personal injuries to opt out if they want to avoid the risk that their claim will be reduced by the claims of others. That is particularly true in this case, which relied upon publication notice rather than individualized notice. Here, it is very possible that individuals with severe, disfiguring injuries will lose their claims without ever actually being aware

they were being adjudicated.  Consequently, approval of this settlement is likely to

foment difficult satellite litigation over whether its release of claims is actually

validly obtained in compliance with due process.  *Spano v. The Boeing Co.*, 633 F.3d

574, 586-87 (7th Cir. 2011) (absent class members are not bound by the result

where representation is conflicted or inadequate).

Here, Plaintiffs discuss certain discovery efforts prior to settlement negotiations;

they do not, however, describe any evidence of Defendants' ability to pay personal

injury claims.  *See* Dkt. # 90 (Mem. In Support of Mot. for Prelim. Approval) at p.

10.   Plaintiffs dispose of the Rule 23(b)(3) superiority requirement in a conclusory

manner that makes no mention of whether Defendants have the ability to pay more

the $10 million in personal injury claims. *Id* at p. 16.

Similarly, class counsel's recent Joint Declaration in support of an anticipated

petition for fees describes investigation and discovery without mentioning any

inquiry whatsoever into the liquid assets, net worth or product liability insurance

coverage of Defendants. *See*  Jnt. Decl. ¶¶25-29 at pp. 8-10 ( Dkt.#106).  The Joint

Declaration also describes Plaintiffs' Motion for Approval to Serve Their First

Request for Production of Documents (Dkt.  #41), wherein Plaintiffs' sought to serve

Defendant with 89 separate discovery requests.   *Id* ¶ 26 at p. 9.  A single request

addressed Unilever's ability to pay claims:

   "82. All insurance policies, indemnification agreements or hold

   harmless agreements that may provide coverage to You, or relating to

   coverage or defense/indemnity obligations that You may have, for any

of the claims or causes of action asserted in this action, …."   Dkt. #41

at p. 19.

The Court's order of August 7, 2013, granted most of those requests, including

Request No. 82.   *See* Memorandum Opinion and Order (Dkt. #51) at p. 62.   Even

though Plaintiffs were granted discovery regarding Unilever's claims

reimbursement insurance, Plaintiffs either did not receive that information, or

neglected to review it, or chose not to use it in their Motion for Final Approval.  *See*

Dkt. # 126 at pp. 20-36.

Moreover, there is no indication whatsoever that Plaintiffs inquired or made any

effort to determine Defendant's liquidity or net worth for the purpose of

ascertaining whether Defendant could pay more in a judgment.  There is therefore

no support for the assertion that $10 million is adequate compensation for the

release of all claims against the Defendant.

### C.  The Settlement Provide No Injunctive Relief.

The Final Judgment approving the Settlement includes no provisions for

injunctive relief. *See* AR 16-23.   That alone would not preclude approval since the

primary goal of the case is financial compensation; but this case presents unique

circumstances in which the omission of injunctive relief highlights the inadequacy

of the relief offered.

### 1.  The Settlement Has No Injunction Against Defendant's Continued Use of Corrosive Thioglycolic Acid in Hair Products.

The Settlement fails to put a stop to Defendant's sales of hair treatments containing thioglycolic acid, a corrosive depilatory that is likely responsible for the scalp burns and permanent hair loss suffered by many members of the provisional Class. Plaintiffs were well aware that Defendant had used thioglycolic acid and closely related hazardous chemicals in hair treatments, and that Defendant would likely do so again in the future. Plaintiffs obtained discovery pursuant to item 24 of their court-approved Request to Serve Discovery ( Dkt. No. 41) of: "[a]ll documents sufficient to identify all [Defendants'] products that contain thioglycolates, Ammonium Thioglycolate, Diammonium Dithiodiglycolate, Thioglycolic Acid, or their salts or esters[.]"

Notwithstanding Plaintiffs presumably obtaining this discovery, Class Counsel failed to negotiate any provisions in the Settlement to prevent Defendant continuing to use these corrosive depilatories in products designed for application to the human scalp. AR 16-23. This factor mitigated against approval and the district court erred in approving such an inadequate Settlement Agreement.

## 2. The Settlement Has No Requirement that Defendant Verify or Enforce its Recall of the Hazardous Product.

Although the Settlement allows class members to sue retailers who do not remove the Product from their shelves, it does not order Defendant to exercise any due diligence in verifying that the Product is in fact taken out of the stream of commerce. AR 34 (Settlement ¶14(G)). In fact, Defendant's recall was not effective in removing Product from retailers' shelves as evidenced by facts alleged by individuals opting-out of the settlement, who were severely injured by Product

29

purchased as late as 2014, *well after* Defendant's recall.    *See* Dkt. # 100 at ECF p. 18 (Decl. of Lori Daniels, Ex. B to Absent Pltffs.' Mot. for Expedited Consideration of Opt Out Requests and to Lift Injunction:  Ms. Daniels was injured by a Smoothing Kit on March 1 or 2, 2014, which had been purchased at a Big Lots store earlier in 2014).

The district court should have been aware of Defendant's mismanagement of its 2012 recall, as demonstrated by explicit allegations filed on September 23, 2013 in Plaintiffs' FAC that "[t]he Product is still available despite Unilever's so-called May 2012 'recall' of the Product."  FAC ¶1.  Disturbingly, the Settlement, ¶ 14(G), merely states that "Unilever represents that it has provided written notice of the recall to retailers and brokers that previously received the Smoothing Kit from Unilever." AR 34.  Thus, the Settlement lacked a vital injunction requiring Defendant to obtain certifications from retailers that they had returned or destroyed unused Product.  This lack of meaningful enforcement of Defendant's purported recall demonstrates that the proposed Settlement was not fair, reasonable, or adequate.

### 3. The Settlement Provides No Relief from Coercive Releases Entered Into by Class Members Prior to Certification or Settlement.

Plaintiffs FAC alleged that "[i]n its continuing efforts to conceal the dangers and serious harm attendant to use of the Product, Unilever has also engaged in a campaign designed to obtain unconscionable and unenforceable releases from consumers injured by use of the Product."  FAC ¶ 3.  Nevertheless, the Settlement unfairly preserved these "unconscionable and unenforceable releases," by providing

no relief for class members who were coerced and/or fraudulently induced to sign unconscionable releases in return for inadequate consideration, some without representation of counsel.  Indeed, the Settlement *excludes* any person who previously signed a release of claims for consideration, notwithstanding Defendant's misconduct committed in the course of obtaining those releases.  *See* AR 14 (class definition).

In the course of the litigation, Plaintiffs failed in their efforts to obtain the Court's order to vacate settlement releases obtained by Unilever.  *See* Dkt. #52 (Memorandum and Order) at pp. 45-56.   Therefore, Plaintiffs were aware, going into settlement negotiations with Defendants, of the injustice worked by these releases, yet failed to extract from Defendants' any relief for the persons who signed away valuable claims.  The district court erred in approving a Settlement that unfairly permitted exclusion of these class members' claims.

## D. The Settlement's Claim Resolution Procedures Are Vague, Arbitrary and Unduly Burdensome.

The Settlement Agreement is unclear how awards will be fairly allotted among claimants if the total awards exceeded the cap.   *See* AR 23 (Settlement Agreement, ¶4(D)) (If the claims awarded exceed the Injury Fund, the "Settlement Administrator shall distribute the funds pro rata, in accordance with a formula to be established by the Special Master and approved by the Court.").  Thus, the claims procedures permitted far too much leeway for the district court to have evaluated whether the ultimate allotment will be fair to the class members.  *See, e.g., In re Katrina Canal Breaches Litigation*, 628 F.3d 185, 194 (5th Cir. 2010)

(district court erred in approving settlement that "punts the difficult question of equitable distribution from the court to the special master, without providing any more clarity as to how fairness will be achieved.").

The Settlement's claims procedure can only be viewed as a "black box," constructed to take in claims and render one-line results according to standards so vague as to be meaningless, but which can never be challenged. Even assuming the utmost good faith and skill on the part of the Special Master, class members can hardly determine prospectively whether the proposed procedure is an acceptable substitute for relinquishing their rights. This should have weighed strongly against the district court's ultimate finding that the benefits provided by the settlement granted significant value to class members. "The court must be assured that the settlement secures an adequate advantage for the class in return for the surrender of litigation rights against the defendants." 4 NEWBERG ON CLASS ACTIONS § 11:46 at 133. But this did not occur.

In addition, the settlement procedures themselves are designed to discourage claimants with significant claims, by requiring burdensome documentation of injuries and representation before the Special Master without any guiding principles of how injuries will be valued. *See, e.g.,* AR 20-23 (Settlement at ¶¶4(B)(vi) and 4(C)(i–iv)). This Court has recently opined that extensive documentation requirements benefit both defendants and class counsel at the expense of the class. *Pearson v. NBTY Inc.,* slip op. at p. 10 (7th Cir. Nov. 19, 2014).

Accordingly, the Settlements' documentation requirements were objectionable and final approval should not have been granted.

### E. The Court's Deferral of the Fee Motion Until After Final Approval was Granted Violated 7th Circuit Precedent, Rule 23, and Class Members' Due Process Rights

Rule 23 expressly permits class members to object to class counsel's request for fees, whether those fees are "authorized by law or by the parties' agreement."  Fed. R. Civ. P. 23(h).  Setting the fee application and hearing process after the deadline for objections is contrary to Rule 23.  *See* Dkt. # 116 (Tina Martin's Objection) at p. 13 (citing *Mercury Interactive Corp. Sec's Litig.*, 618 F.3d 988, 994 (2010)) (finding it an abuse of discretion and a denial of due process to require objections to be filed before class counsel's fee applications). The Seventh Circuit recently followed *Mercury Interactive* in *Redman v. RadioShack Corp.*, 7th Cir. No. 14-1470, 2014 WL 4654477 (7th Circuit, Sept. 19, 2014) (Posner, J.) (calling the same procedure "unlawful" in the course of reversing settlement approval).  Here, the class notice disclosed the gross fee that counsel were going to be seeking, but that is all.  The settling parties then deferred the fee motion until after objections were due, and made no provision for class members to object to the fee motion.  The district court approved this procedure, permitting a fee motion and proceeding to arise after final judgment approving the settlement occurred, and after the objection deadline.  *See* AR 86.  This deprived Class Objector-Appellant Martin and other class members of their right to have the fee motion directed to them in a reasonable and meaningful manner.

## CONCLUSION

For the foregoing reasons, the district court's final approval of the class action settlement agreement should be reversed.

Dated:  January 6, 2015                THE LAW OFFICES OF RONALD
                                       A. MARRON, APLC

                                       /s/ *Ronald A. Marron*

                                       Ronald A. Marron

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by

Circuit Rule 30(a) and (b) are included in the appendix.

Dated:  January 7, 2015                              THE LAW OFFICES OF RONALD

A. MARRON, APLC

/s/ *Ronald A. Marron*

Ronald A. Marron

CERTIFICATE OF COMPLIANCE WITH
TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

_X_ this brief contains 8259 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

__this brief uses a monospaced typeface and contains [state the number of ] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

_X_this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 software in 12 point Century and Bookman font size and styles, or

__this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

Dated:  January 7, 2015              THE LAW OFFICES OF RONALD

                                    A. MARRON, APLC

                                    /s/ *Ronald A. Marron*

                                    Ronald A. Marron

CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system on January 7, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  January 7, 2015                    THE LAW OFFICES OF RONALD

A. MARRON, APLC

/s/ *Ronald A. Marron*

Ronald A. Marron